NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0508n.06

No. 12-2420

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jul 11, 2014*
DEBORAH S. HUNT, Clerk

TRIMAS CORPORATION, )
)
    Plaintiff - Appellee, )
)
v. ) ON APPEAL FROM THE UNITED
) STATES DISTRICT COURT FOR THE
WILLIAM E. MEYERS, ) EASTERN DISTRICT OF MICHIGAN
)
    Defendant - Appellant. )
) **OPINION**
)
)

Before: KEITH, WHITE, and STRANCH, Circuit Judges.

**JANE B. STRANCH, Circuit Judge.** In May of 2009, William E. Meyers—then 76 years of age—received notice that his retirement benefits would no longer be paid to him. This case is one of several litigated over the past five years in which Mr. Meyers—now 81 years of age—has been forced to wade through a web of corporate entities and financial transactions seeking to determine who is responsible for paying his retirement benefits. All deny that responsibility.

Meyers served as an executive for TriMas Corporation from 1987 until he retired at age 65 in 1998. He received benefits under a Supplemental Executive Retirement Plan (SERP) issued by TriMas in 1995 and later amended by TriMas's successor, MascoTech, in 2000. The benefits continued until May 2009, when MascoTech's successor, Metaldyne, filed for bankruptcy protection. Meyers pursued several avenues to obtain payment of his retirement benefits,

1

including a demand that TriMas participate in arbitration under the 1995 SERP agreement. TriMas refused to arbitrate and filed this declaratory judgment action seeking an order that it has no duty to arbitrate or to pay retirement benefits to Meyers.

The district court denied Meyers's motion to compel arbitration and granted summary judgment in favor of TriMas; Meyers appealed. For the reasons explained below, we REVERSE summary judgment for TriMas, REVERSE the denial of Meyers's Motion to Arbitrate and Dismiss the Complaint, and REMAND the case for further proceedings consistent with this opinion.

## I. BACKGROUND

TriMas is a Delaware corporation with its manufacturing headquarters in Michigan. Initially formed by Masco Corporation in 1987, TriMas later became publicly owned in 1991. Masco Corporation also partially owned MascoTech, a minority owner of TriMas. Both TriMas and MascoTech entered into administrative service agreements with Masco Corporation to obtain corporate services, such as accounting, legal, payroll, pension, and profit-sharing administration. Masco Corporation provided these services to TriMas in return for a percentage of TriMas's revenues. Through this arrangement, TriMas was able to operate a $650 million company with a small staff.

Upon beginning operations in August 1987, TriMas recruited Meyers, who was then 55 years old, to leave his employment in Pennsylvania and move to Michigan to serve as Vice President, Controller, and Chief Accounting Officer of TriMas. Meyers accepted the position because it offered financial security in retirement. During compensation negotiations, TriMas promised to provide Meyers with a SERP if TriMas was a successful entity.

In 1994, TriMas issued SERPs to all corporate executives, including Meyers. Minor changes were made to the SERPs in 1995. Meyers's SERP was memorialized in a letter agreement dated February 28, 1995, which was executed by Meyers and TriMas's CEO, Richard Manoogian (the 1995 SERP). The 1995 SERP remained in effect until Meyers retired from employment at TriMas at age 65 in 1998.

The 1995 SERP provided that it was governed by Michigan law and that "arbitration shall be the sole and exclusive remedy to resolve all disputes, claims or controversies which could be the subject of litigation . . . involving or arising out of this Agreement." The SERP further provided that because "we acknowledge that . . . arbitration is the exclusive remedy, neither of us or any party claiming under this Agreement has the right to resort to any federal, state or local court or administrative agency concerning any matters dealt with by this Agreement and that the decision of the arbitrator shall be a complete defense to any action or proceeding instituted in any tribunal or agency with respect to any dispute." The agreement also provided that "[t]he arbitration provisions contained in this paragraph shall survive the termination or expiration of this Agreement, and shall be binding on our respective successors, personal representatives and any other party asserting a claim based upon this Agreement."

As Controller, Meyers knew that the liability for his SERP fully vested when he reached age 65 and that, based on conventional accounting standards, expenses for his SERP were charged during the period he performed services for TriMas between 1994 and 1997. The present value of the full liability of Meyers's SERP was recorded in the accounting records of TriMas in 1998 upon his retirement.

Around the same time Meyers retired, MascoTech acquired TriMas and took the company private. Meyers's benefits under the 1995 SERP were paid from a MascoTech account.

In 2000, a private equity firm, Heartland Industrial Partners, acquired MascoTech. At that time, MascoTech and TriMas lost their public status. MascoTech and Meyers executed an amended and enhanced SERP (the 2000 SERP). The 2000 SERP included provisions that, if there were to be a change in control following Heartland's acquisition, the SERP payments would be accelerated and paid to Meyers in a lump sum. The 2000 SERP was memorialized in a letter agreement signed by Meyers and Manoogian, who executed the agreement as Chairman of the Board for MascoTech. The 2000 SERP was governed by Michigan law and, in language verbatim to that used in the 1995 SERP, required arbitration of any disputes.

The 2000 SERP stated: "Provided you agree to waive and release all claims [under the 1995 SERP], this Agreement reflects [MascoTech's] assumption of all of TriMas' obligations to you under [the 1995 SERP] and further amends and replaces in its entirety your previously signed [1995 SERP] with TriMas Corporation and describes in full your benefits pursuant to the Plan and all of [MascoTech's] obligations to you, and yours to [MascoTech]." The agreement further provided that "[i]n consideration of the mutual covenants contained herein, your execution of this Agreement evidences your knowing, full, and final release and discharge . . . of TriMas Corporation, [MascoTech], its and their subsidiaries and affiliates (including Masco Corporation) . . . of and from all claims, demands, actions and causes of action which you have or had . . . for or by reason of any matter, cause or thing founded in, arising under or derivative of [the 1995 SERP with TriMas]."

In 2001, Heartland changed the name of MascoTech to Metaldyne. Meyers continued to receive SERP payments from Metaldyne. In 2002 Heartland, Metaldyne, and TriMas entered into an agreement relating to Heartland's purchase of TriMas common stock. In the stock-purchase agreement, TriMas agreed to "assume, discharge, pay and be solely liable for and

4

shall indemnify and hold [Metaldyne] and its Subsidiaries harmless from and against all Losses relating to any claim or liability arising out of the employment of . . . Former Employees (including any liability for . . . supplemental executive retirement plans)." As a result of the stock purchase agreement, TriMas once again became a publicly-held company.

In 2006, Heartland took steps to sell Metaldyne. We recently described the alleged sequence of this sale in a related case, *Gardner v. Heartland Indus. Partners*, *LP*, 715 F.3d 609 (6th Cir. 2013):

> In August 2006, Heartland agreed to sell its ownership interest in Metaldyne to another investment firm, Ripplewood Holdings. Less than two months later, Metaldyne submitted to the SEC a "Schedule 14A and 14C Information" report that detailed the terms of the acquisition. The report failed to mention, however, that Metaldyne would owe [its retired executives] approximately $13 million as a result of the sale to Ripplewood. That obligation arose under a change-of-control provision in Metaldyne's [2000 SERP], in which [Meyers and other executives] were participants. The SERP is a plan subject to ERISA.
>
> Ripplewood threatened to back out of the deal when it found out about the $13 million SERP obligation. In response, [Timothy D.] Leuliette and [Daniel] Tredwell [of Heartland] persuaded Metaldyne's Board (of which they were Chairman and a Member, respectively) simply to declare the SERP invalid. The Board did so on December 18, 2006, though it did not notify [the retired executives] of that fact at the time. The Ripplewood deal closed less than a month later, on January 11, 2007. Leuliette personally collected more than $10 million as a result of the deal.

*Id.* at 611‒12. In this case, the parties explain that, as a result of the sale, Metaldyne became a subsidiary of Asahi-Tec Corporation.

In late February 2007, Meyers received a letter from Metaldyne's corporate counsel, Laurel Krueger, stating that the Compensation Committee of Metaldyne's Board of Directors made a conclusive and binding decision on December 18, 2006, that "all supplemental executive retirement agreements entered into on or around November 2000 are invalid" and that the

5

Metaldyne Board of Directors ratified the action of the Compensation Committee on the same day. The letter further stated that "Metaldyne is not disputing your rights to receive benefits under" the 1995 SERP with TriMas Corporation.

Metaldyne continued to pay Meyers's SERP benefits. TriMas reported in its filings with the Securities Exchange Commission (SEC) and in notes to its financial statements that it had assumed "liabilities and obligations" from Metaldyne pursuant to the 2002 stock purchase agreement and those liabilities were "mainly comprised of contractual obligations to former TriMas employees, tax-related matters, benefit plan liabilities and reimbursements to Metaldyne for normal course payments to be made on TriMas' behalf."

Meyers and other retired executives sued Metaldyne for the enhanced benefits they claimed to be owed under the 2000 SERP as a result of the change in control that occurred when Heartland sold Metaldyne to Ripplewood. *Gardner et al. v. Metaldyne Corp.*, No. 08-cv-11076 (E.D. Mich. filed Mar. 12, 2008) ("*Meyers I*"). In that case, the plaintiffs asserted that "Metaldyne is responsible for all benefits under the [2000 SERP]" and that Metaldyne's refusal to honor its obligations was a breach of the terms of the 2000 SERP. While that case was pending, Metaldyne filed for bankruptcy protection and stopped paying benefits or providing healthcare to Meyers and his spouse under the 2000 SERP. *In re Metaldyne*, No. 09-13412 (Bankr. S.D.N.Y.). The *Meyers I* court administratively closed the case due to Metaldyne's bankruptcy filing. The bankruptcy case remains pending and *Meyers I* is still closed.

Meyers then filed an amended proof of claim in the bankruptcy case alleging that Metaldyne owed him benefits under the 2000 SERP and under a Metaldyne Benefit Restoration Plan (BRP). Meyers settled one component of his claim in the bankruptcy case, but he retained

6

the right to prosecute the SERP and BRP components of his claim and the debtors reserved their right to object.

In August 2009, Meyers and others filed a lawsuit against Heartland and two of its founders in Wayne County Circuit Court in Michigan. The suit alleged that the defendants tortiously interfered with the Metaldyne 2000 SERP by persuading and directing Metaldyne to declare the 2000 SERP invalid. The defendants removed the case to federal court, where the district court granted a motion to dismiss, holding that the tortious interference claim was preempted by ERISA. In May 2013, this court reversed that decision and remanded the case to the district court with instructions to remand the case to Michigan state court. *See Gardner*, 715 F.3d at 615 ("*Meyers II*").

Meyers also demanded payment of benefits from TriMas under the 1995 SERP and the 2002 stock purchase agreement. TriMas denied any direct liability for Meyers's benefits. TriMas advised Meyers that he would have to arbitrate any claim against TriMas as required by the 1995 SERP.

Taking the cue, in December 2010 Meyers demanded that TriMas participate in arbitration as required by the 1995 SERP. TriMas then declined and instead filed this declaratory judgment action in federal court requesting an order holding that no enforceable contract exists requiring TriMas to arbitrate Meyers's claim for benefits or to pay Meyers benefits. Meyers moved to compel arbitration and dismiss the complaint. TriMas moved for summary judgment. The district court declined to compel arbitration and granted summary judgment on the merits in favor of TriMas. Meyers then appealed.

7

## II. ANALYSIS

We review de novo the district court's grant of summary judgment, *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014), and likewise review de novo the court's decision concerning whether to compel arbitration, *Hergenreder v. Bickford Senior Living Grp., LLC*, 656 F.3d 411, 415 (6th Cir. 2011). We retrace the steps of the district court to resolve this appeal.

### A. Inconsistent statements

The district court first ruled that Meyers could not assert a right to benefits against TriMas under the 1995 SERP because Meyers had declared in prior litigation—*Meyers I*, *Meyers II*, and Metaldyne's bankruptcy case—that the 2000 SERP is the operative agreement. Citing *Ferguson v. Neighborhood Housing Services of Cleveland, Inc.*, 780 F.2d 549, 551 (6th Cir. 1986), *Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000), and *Hughes v. Vanderbilt University*, 215 F.3d 543, 549 (6th Cir. 2000), the court determined that Meyers's "inconsistent statements in this case cannot establish that the 2000 SERP is not the operative agreement."

The district court misapplied these cases. In *Ferguson*, *Barnes*, and *Hughes* we discussed the effect of a party's admission to a particular fact in a pleading. In *Ferguson*, a defendant admitted in its answer to the complaint that it qualified as an "employer" for purposes of the Fair Labor Standards Act. *Ferguson*, 780 F.2d at 550. That factual admission, which provided a basis for federal jurisdiction, later precluded the defendant from challenging the district court's subject-matter jurisdiction. *Id.* at 551. We noted in *Ferguson* that judicial admissions eliminate any need to produce evidence on the subject matter of the admission because the admitted fact is no longer at issue. *Id.* at 550–51. In *Barnes*, the question was whether the district court abused its discretion when it allowed the defendant to read portions of the plaintiffs' complaints into evidence at trial. *Barnes*, 201 F.3d at 829. Although the issue was complicated by a hearsay

8

component not relevant here, we nonetheless explained that pleadings in a prior case may be utilized as evidentiary admissions during a jury trial. *Id.* We said that "[j]udicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Id.* (internal quotation marks omitted). In *Hughes*, the plaintiff stated in her complaint that her claim accrued on a certain date. *Hughes*, 215 F.3d at 549. We affirmed the district court's use of that date to decide the timeliness of the plaintiff's claim, observing that "[p]laintiffs are bound by admissions in their pleadings, and a party cannot create a factual issue by subsequently filing a conflicting affidavit." *Id.* In all three cases, we applied the governing principle that stipulations and admissions to facts in the pleadings are generally binding on the parties as well as the trial and appellate courts. *Ferguson*, 780 F.2d at 551; *Barnes*, 201 F.3d at 829; *Hughes*, 215 F.3d at 549.

These cases have no application here. The district court did not apply their governing principle—it did not bind Meyers to an admitted fact in his current pleadings so that he is precluded from producing contradictory evidence as to that fact during a later stage of this litigation. Rather, the court improperly relied on *Ferguson*, *Barnes*, and *Hughes* to conclude that Meyers made inconsistent statements when he argued the theory here that the 1995 SERP requires TriMas to arbitrate and pay benefits, yet he advocated in different pending litigation involving other parties the theory that the 2000 SERP requires Metaldyne to pay benefits.

The district court may have had in mind the concept of judicial estoppel, but the court did not address that doctrine and, in any event, it does not apply in this case. "Judicial estoppel generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000). Judicial estoppel equitably "preserves the integrity of the courts by preventing a party

9

from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment." *Lorillard Tobacco Co. v. Chester, Willcox & Saxbe*, 546 F.3d 752, 757 (6th Cir. 2008) (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1217–18 (6th Cir. 1990)). If a party takes a position in litigation and succeeds in maintaining it, he may not later assume a contrary position just because his interests have changed, particularly if the party affected by the former position would suffer prejudice. *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Judicial estoppel must be cautiously applied to avoid impingement on the truth-seeking function of the courts. *Lorillard Tobacco Co.*, 546 F.3d at 757.

We are not persuaded that Meyers's efforts to determine which of the responsibility-denying entities in this complex web of corporate relationships is responsible for his pension is appropriately labeled an inconsistency. But even if we were to assume that Meyers has taken inconsistent legal positions in this suit and in other litigation, judicial estoppel does not apply because Meyers has not had "the requisite success in the initial assertion of the inconsistent position." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 600 (6th Cir. 1982). Despite five years of litigation, Meyers has not prevailed in *Meyers I*, *Meyers II*, or in Metaldyne's bankruptcy case. Moreover, this suit springs from Metaldyne's own statement through its corporate counsel that Metaldyne does not dispute Meyers's entitlement to benefits from TriMas under the 1995 SERP.

Where an equitable doctrine like judicial estoppel is in play, we do not lose sight of the equities in the case. Metaldyne pointed Meyers to the 1995 SERP as the source of his benefits and to TriMas as the responsible paying party. When Meyers asked TriMas to pay, TriMas refused and reminded Meyers that any dispute under the 1995 SERP must be arbitrated. Yet, when Meyers demanded that TriMas arbitrate under the 1995 SERP, TriMas filed this federal

10

lawsuit seeking to avoid arbitration and the payment of benefits. We find it indisputable that the equities reside with Meyers.

Judicial estoppel is not a technical means "to derail potentially meritorious claims." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 365 (3d Cir. 1996) (internal quotation marks, citations, and alterations omitted). The doctrine is used only to avoid a miscarriage of justice, *id.*, and no miscarriage of justice will occur if Meyers is allowed to proceed against TriMas under the 1995 SERP and against Metaldyne under the 2000 SERP in an effort to obtain the benefits he claims are owed to him. The district court erred in granting summary judgment for TriMas in part on this ground.

## B. Existence of a valid agreement to arbitrate

In the second and third steps of its analysis, the district court determined that Meyers's "argument against the validity of the 2000 SERP . . . is flawed for other reasons." The court faulted Meyers for "relying on Metaldyne's declaration—made without [TriMas's] involvement—that the 2000 SERP was invalid" and for then making "his own declaration that the 1995 SERP was somehow reinstated after Metaldyne's purported invalidation of the 2000 SERP." According to the court,

> neither Metaldyne's unilateral declaration, nor Meyers' reliance upon it, binds this Court or has the operation of law. This is a declaratory action, not a contract case. The 2000 SERP's validity is an issue . . . for [the] *Meyers I* court to decide—not one a non-party (Metaldyne) may adjudicate by fiat. As there is nothing to indicate otherwise, the Court *presumes* that the 2000 SERP remains effective.

R. 18 Page ID 978 (emphasis added).

This reasoning is confusing: The court avoids TriMas's request for a declaratory judgment that the 1995 SERP is unenforceable, yet the court simultaneously presumes the 2000 SERP is valid. Skipping any legal or factual inquiry into the validity or continuing existence of

11

the 1995 and 2000 SERPs, the court ruled that Meyers, by signing the 2000 SERP, expressly waived any claims he had against TriMas so that "TriMas has no obligation to go to arbitration, as the arbitration clause was part of the 1995 SERP, not the 2000 SERP." The latter part of this statement is perplexing because both the 1995 SERP and the 2000 SERP contain identical arbitration clauses. Finally, the court said, even assuming the 2000 SERP was somehow invalidated, nothing in the record indicated that the 1995 SERP containing the arbitration clause was automatically reinstated. The court ultimately held that no reasonable jury could find TriMas must arbitrate Meyers's claim for SERP benefits. Because TriMas has no obligation to arbitrate the dispute or pay benefits under the 1995 SERP, the court denied Meyers's Motion to Compel Arbitration and Dismiss the Complaint and granted summary judgment for TriMas.

We disagree with the district court's analysis. Interpreting the Federal Arbitration Act (FAA), we have previously stated that "[a] written agreement to arbitrate disputes arising out of a transaction in interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (quoting 9 U.S.C. § 2). The FAA allows a stay of proceedings when an issue is referable to arbitration, as well as an order "compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *Id.* (citing 9 U.S.C. §§ 3 & 4). The FAA manifests a "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), and "guarantee[s] the enforcement of private contractual arrangements" by creating federal substantive law to regulate the duty to honor one's agreement to arbitrate. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985); *Prima Paint v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403 (1967).

Before compelling a party to arbitrate, the district court must decide whether the dispute is arbitrable; the court must determine that a valid agreement to arbitrate exists between the parties and that the specific dispute at hand falls within the substantive scope of the arbitration agreement. *See Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 n.2 (2013) (observing that "gateway matters," such as whether a valid arbitration agreement exists and whether an arbitration clause applies to the controversy, are for the courts to decide); *Hergenreder*, 656 F.3d at 415.   Because arbitration agreements are contracts, courts evaluate the enforceability of an arbitration agreement in accordance with applicable state contract law.   *Hergenreder*, 656 F.3d at 416.

TriMas does not dispute the making of the 1995 SERP or that Meyers's benefits were initially paid under that agreement.   Rather, TriMas contends that the 1995 SERP was extinguished when Meyers and Metaldyne executed the 2000 SERP.   Under that agreement, Metaldyne assumed "all of TriMas' obligations" to Meyers under the 1995 SERP, and the 2000 SERP "amend[ed] and replace[d] in its entirety" the 1995 SERP.   Furthermore, in the 2000 SERP, Meyers expressly waived all claims against TriMas.

For his part, Meyers also does not dispute the formation of the 1995 SERP or the 2000 SERP.   But he argues that Metaldyne unilaterally invalidated the 2000 SERP in December 2006, and because that contract was invalided as void or voidable, the 1995 SERP was restored as a matter of contract law.   Thus, TriMas is required to arbitrate and pay benefits under the restored 1995 SERP or as a result of TriMas's obligations under the 2002 Stock Purchase Agreement.

The district court completely bypassed these issues, but they must be tackled before the declaratory judgment suit finally can be resolved.   The court correctly noted that the validity of the 2000 SERP is at issue in *Meyers I*, but that case has been stayed several years due to Metaldyne's bankruptcy and we can only speculate when that case might reopen.   The existence

13

of the *Meyers I* lawsuit─between Meyers and Metaldyne─does not relieve the district court of the obligation to decide in this case─between TriMas and Meyers─whether the 1995 SERP was revived when Metaldyne invalidated the 2000 SERP. The *Meyers I* court may decide eventually whether Metaldyne owes benefits to Meyers under the 2000 SERP, but the question awaiting resolution here is whether TriMas owes benefits to Meyers under the 1995 SERP. In *Meyers II,* Meyers seeks damages from Heartland and its founders for their alleged tortious interference with the 2000 SERP, but that case will not necessarily put to rest whether TriMas is obligated for benefits under the 1995 SERP or the 2002 stock purchase agreement. Considering the whole of the litigation that has been pending for five years, we think it unlikely that Meyers will ever obtain a double recovery. If that should come to pass, however, the courts are well-equipped to ensure that Meyers does not receive a windfall but only what is rightfully due to him.

Returning to this case, the parties have identified questions of law and fact that must be explored before the district court can decide whether a valid agreement to arbitrate between these parties exists. *See Hergenreder*, 656 F.3d at 415. In Michigan "[i]t is undoubtedly the law that, if a void or voidable contract is substituted for a valid pre-existing obligation, and the substituted contract is later rescinded, because void or voidable, the pre-existing valid contract is restored, as if nothing had happened." *Travelers Ins. Co. v. Carey*, 180 N.W.2d 68, 72 (Mich. Ct. App. 1970) (quoting *Indiana Flooring Co. v. Grand Rapids Trust Co.,* 20 F.2d 63, 65 (6th Cir. 1927)); *Simmons v. United Presidential Life Ins. Co.*, 911 F.2d 733 (6th Cir. 1990) (unpublished table opinion); Restatement (Second) of Contracts § 279; 13-71 *Corbin on Contracts*, § 71.1 ("If the power of avoidance is exercised, the avoided [substitute] contract is nullified both as an executory contract and as a discharge of the original claim. The prior claim is reinstated and again enforceable."). This law may support Meyers's argument that the 1995 SERP was restored upon

14

the invalidation of the 2000 SERP. Additionally the question arises whether the arbitration clause in the 1995 SERP persists after termination of the agreement by operation of the survival clause in the agreement. Further, a separate question remains as to whether TriMas reassumed liability for Meyers's benefits in the 2002 Stock Purchase Agreement and if so, whether that dispute is arbitrable.

The only indication about these matters in the record before us is Metaldyne's 2007 letter to Meyers. That letter suggests that Metaldyne viewed the 1995 SERP as restored by its invalidation of the 2000 SERP because it did not dispute Meyers's continued right to receive his benefits under that agreement, and in fact, Metaldyne continued to pay Meyers benefits until May 2009. On the present factual record, the most reasonable inference to be drawn is that Metaldyne continued to make the payments to Meyers under the 1995 SERP with indemnification by TriMas pursuant to the 2002 Stock Purchase Agreement. But that inference may be disproved by further discovery.

We return these legal and factual issues to the district court for disposition. The present record is sufficient for us to decide that TriMas has not established its entitlement to summary judgment as a matter of law. Remand is necessary so the parties can conduct any necessary discovery and further brief the legal issues. Only then will the district court be in a position to undertake the necessary job of determining whether a valid contract to arbitrate exists and whether the parties' dispute falls within the scope of that arbitration agreement. *See Hergenreder*, 656 F.3d at 415.

## III. CONCLUSION

For all of the above reasons, we REVERSE the district court's grant of summary judgment in favor of TriMas and the denial of Meyers's Motion to Compel Arbitration and Dismiss the

15

Complaint, and REMAND the case to the district court for further proceedings consistent with this opinion.