*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 11a0247p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

—————————————

MAUREEN HERGENREDER,
    *Plaintiff-Appellant,*

  *v.*

BICKFORD SENIOR LIVING GROUP, LLC,
    *Defendant-Appellee.*

No. 10-1474

—————————————

Appeal from the United States District Court
for the Eastern District of Michigan at Bay City.
No. 09-13347—Thomas L. Ludington, District Judge.

Argued: June 8, 2011

Decided and Filed: August 30, 2011

Before: DAUGHTREY, MOORE, and STRANCH, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Mandel I. Allweil, HURLBURT, TSIROS & ALLWEIL, P.C., Saginaw, Michigan, for Appellant. Jeffrey D. Hanslick, HUSCH BLACKWELL SANDERS LLP, Kansas City, Missouri, for Appellee. **ON BRIEF:** Mandel I. Allweil, HURLBURT, TSIROS & ALLWEIL, P.C., Saginaw, Michigan, for Appellant. Shaun C. Southworth, HUSCH BLACKWELL SANDERS LLP, Kansas City, Missouri, for Appellee.

—————————————

**OPINION**

—————————————

KAREN NELSON MOORE, Circuit Judge. Maureen Hergenreder began working as a nurse for Bickford Senior Living Group in early November 2006. She filed this suit after she was fired from her job with Bickford in January 2007, alleging that her firing was in violation of the Americans with Disabilities Act. In response, Bickford filed a motion to stay the proceedings and compel arbitration. The district court granted

this motion and dismissed the case, finding that Hergenreder assented to a valid agreement to arbitrate the claims she has brought in this suit. Hergenreder now appeals.

Because there is no indication that Hergenreder was notified of the existence of the arbitration agreement, much less that she manifested an intent to agree to its terms, we **REVERSE** the judgment of the district court and we **REMAND** this case for further proceedings consistent with this opinion.

## I.  BACKGROUND INFORMATION

Maureen Hergenreder was hired as a nurse for the Bickford Senior Living Group in October 2006. A short time later, she was diagnosed with cancer and took a leave of absence for treatment. The treatment was apparently successful and Hergenreder was prepared to return to work by late December 2006, but she was told not to return by her supervisor because the facility at which Hergenreder was to work had not yet opened and a backup nurse was not needed. On January 12, 2007, Hergenreder was told by her supervisor over the phone that she was fired, R. 1 at 5 (Complaint), and on January 25, 2007, Hergenreder received a letter from her supervisor stating that "Your RN status at Bickford Cottage of Saginaw was terminated on December 12, 2006 due to your surgery and recuperation time. Since you were a new salaried employee and did not have any accrued PTO time or FMLA, it is HR policy to terminate you with rehire status." Hergenreder Br. at Ex. 10. Believing that her firing was in violation of the Americans with Disabilities Act, Hergenreder sued Bickford in August 2009. In response, Bickford filed a motion to stay the proceedings and compel arbitration. The district court granted this motion and dismissed the case, finding that Hergenreder assented to a valid agreement to arbitrate the claims she has brought in this lawsuit. Hergenreder now appeals.

When Hergenreder began her employment, she signed numerous documents, including her employment application, tax and insurance forms, a background-check-consent form, a form agreeing to notify Bickford of any subsequent criminal convictions, and a form acknowledging that she received notice of Bickford's worker's compensation

procedure. It is undisputed, however, that none of these documents mentioned anything about arbitration. *See* Hergenreder Br. at Ex. 7 (Aff. of Maureen Hergenreder at ¶¶ 21–22); *see generally* Bickford Br. Hergenreder also signed an acknowledgment that she had read and understood the terms of Bickford's Employee Handbook.

The Employee Handbook—and whether it does or does not inform Hergenreder of Bickford's arbitration policy—plays the central role in this appeal. The Handbook is divided into sixteen different sections, covering a wide variety of topics relevant to Hergenreder's employment. It begins by stating in Section I that "[i]t will acquaint you with the policies and procedures that apply to your employment," but also that "[t]his handbook is intended as a summary only and is not a contract between Bickford Cottage and its employees. A full copy of Bickford Cottage's Personnel Policies is located in the Director's office and may be viewed by any employee." Hergenreder Br. at Ex. 11 at 4 (Employee Handbook) (hereinafter "Handbook"). It ends by stating, in Section XVI, that:

> This handbook has been provided to you for the purpose of acquainting you with the personnel policies and procedures, responsibilities of Bickford Cottage. It does not constitute a contract of employment in whole or in part. Bickford Cottage may add to, change or delete any of the contents at any time with no notice.

Handbook at 28. Based on these statements, the parties agree that the terms of the Handbook are not part of a contract.

What the parties do not agree on, however, is the significance of one sentence within Section XII, which is entitled "Employee Actions," and which provides, in full, as follows: "*Dispute Resolution Process*  Please refer to the Eby Companies Dispute Resolution Procedure (DRP) for details." Handbook at 19 (emphasis in original). Review of the Eby Companies Dispute Resolution Procedure ("DRP") makes clear in both an eleven-page summary of the procedure as well as the nine-page procedure itself

that all employees are required to submit all covered claims against Bickford to binding arbitration.**1**  The procedure provides that:

> This policy becomes effective on June 1, 2004 for all persons employed by any Eby Company[, one of which is Bickford].  Any person who applies for a job with an Eby Company on or after June 1, 2004 or who continues to be employed by an Eby Company on or after June 1, 2004, agrees, as a condition of employment, that all covered claims are subject to the DRP and to accept an arbitrator's (or arbitrators') award as the final, binding, and exclusive determination of all covered claims.

Bickford Br. at Ex. 1 (DRP at 8).  The summary contains a materially indistinguishable statement.  *Id.* at Ex. 1 (DRP Summ. at 2).

At the end of the DRP is a form entitled "Agreement to Dispute Resolution Procedure," which provides, among other things, that the signers:

> understand that The Eby Group . . . has adopted a Dispute Resolution Procedure ("DRP") as an employee benefit for the resolution of employment disputes. . . .

> By continuing my employment with The Eby Group or by accepting an offer of employment with The Eby Group or by submitting an application for employment to The Eby Group, and in consideration thereof, I agree to submit all covered claims to The Eby Group's DRP and to accept the outcome of the DRP including an arbitrator's (or arbitrators') award . . . .

> THIS AGREEMENT CONTAINS A BINDING ARBITRATION PROVISION THAT MAY BE ENFORCED BY THE PARTIES.

*Id.* at Ex. 1 (DRP at 9).  In the Frequently Asked Questions portion of the DRP Summary, Bickford answers the question, "Why am I being asked to sign a written agreement to the Dispute Resolution Procedure?" with the following:

> While your employment and/or continued employment is all that is required for you to be bound to resolve your employment disputes with The Eby Group under the DRP, the Company is committed to this new program and is requesting every employee to commit to it in writing on a form prepared by the Company which signed form will be placed in your personnel file.

---

**1**The parties do not dispute that the claims in this suit are covered claims.

*Id.* at Ex. 1 (DRP Summ. at 5).   Although the text of this answer indicates that a "commit[ment]" is made by the parties, this commitment must be purely a symbolic one, given that a *legal* commitment is made only by entering or continuing employment with Bickford.   The implicit message in this answer, then, seems to be the important one: Bickford asks employees to sign the agreement so that there will be objective evidence of the employee's agreement to submit all covered claims to binding arbitration, even though the employee's signature is not necessary to enter into the agreement.   The wisdom behind an employer's desire to have objective evidence of an employee's assent to arbitration is clear:   an acknowledgment form, signed after an employee has been given a copy of an arbitration agreement, can serve as ironclad proof that an employee was reasonably notified of an arbitration agreement.   Put another way, the acknowledgment form decreases the possibility that Bickford might have an employee who has never seen or signed any arbitration documents.

Hergenreder swears that she has "never seen or signed any of these documents," referring to the DRP.   Hergenreder Aff. at ¶ 23.   Moreover, she avers, "I have never, to my knowledge, signed any Agreement with the Defendant that gave up my right to a jury trial and that compelled me to file for Arbitration for any type of wrongful discharge claim.   No one ever even raised the issue of Arbitration in all of the forms that I signed as part of the hiring process." *Id.* at ¶¶ 21–22.   Bickford has not provided a copy of the DRP with an acknowledgment form signed by Hergenreder.   Instead, it has provided an affidavit from its Vice President of Employee Relations, Jerry Knight, who states that the DRP "is distributed to employees."   R. 13-4 at 2 (Knight Aff.).

In response to Bickford's Motion to Compel Arbitration, the district court held that Hergenreder was bound by the DRP and therefore was required to submit her claims in this suit to binding arbitration.   The district court therefore dismissed this suit. Hergenreder filed a timely notice of appeal.

## II. ANALYSIS

This court reviews de novo a district court's decision on whether to compel arbitration pursuant to the Federal Arbitration Act. *Mazera v. Varsity Ford Mgmt. Servs., LLC*, 565 F.3d 997, 1001 (6th Cir. 2009). "The court must determine whether the dispute is arbitrable, meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of the agreement." *Id.* (internal quotation marks omitted).

Hergenreder makes three arguments against the district court's order, all of which establish, she asserts, that she is not bound by any arbitration agreement with Bickford. First, she argues that she was never advised about any arbitration policy and that she "never saw or signed any arbitration agreement." Hergenreder Br. at 11; *see also* Ex. 7 at ¶¶ 21–23. Second, she argues that nothing in the Handbook constitutes a legally binding contract and that nothing in the Handbook mentions arbitration. Third, she argues that there is nothing else in the record that constitutes an agreement to submit her claims to arbitration.

Bickford disputes only some of these contentions. First, it agrees that the Handbook does not constitute a legally binding contract. It also apparently does not dispute that Hergenreder did not sign the DRP, and despite Knight's affidavit stating that the DRP "is distributed to employees," Bickford does not in any way dispute Hergenreder's sworn statement that she has not seen the DRP. Instead, what Bickford *does* dispute are Hergenreder's claims that she was not advised of the DRP and that nothing else in the record establishes that a legally binding agreement to arbitrate was created between Hergenreder and Bickford.

## A. Michigan Contract Law Determines Whether An Arbitration Agreement Was Formed Here.

"A written agreement to arbitrate disputes arising out of a transaction in interstate commerce 'shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003) (quoting 9 U.S.C. § 2); *see also* 9 U.S.C. § 3

(providing for a stay of any federal lawsuit involving issues subject to an arbitration agreement).  "To enforce this dictate, the Federal Arbitration Act (FAA) provides for a stay of proceedings when an issue is referable to arbitration and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement."  *Javitch*, 315 F.3d at 624 (citing 9 U.S.C. §§ 3 and 4).  Furthermore, "Manifesting a 'liberal federal policy favoring arbitration agreements,' the FAA 'is at bottom a policy guaranteeing the enforcement of private contractual arrangements.'"  *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 625 (1985)).  "Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement."  *Id.*; *see also Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, — U.S. —, 130 S. Ct. 1758, 1774 (2010) (stating that the parties are free to specify "the issues they choose to arbitrate," "rules under which any arbitration will proceed," "who will resolve specific disputes," and "*with whom* they choose to arbitrate their disputes") (emphasis in original).

"Because arbitration agreements are fundamentally contracts, we review the enforceability of an arbitration agreement according to the applicable state law of contract formation."  *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943–44 (1995)).  When it comes to "state laws applicable *only* to arbitration provisions," however, the Federal Arbitration Act preempts those state laws.  *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (emphasis in original); *see also Arthur Andersen LLP v. Carlisle*, 129 S. Ct. 1896, 1902 (2009) ("State law . . . is applicable to determine which contracts are binding under § 2 and enforceable under § 3 *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts *generally*.") (second emphasis added; internal quotation marks omitted).

Under Michigan law, "Before a contract can be completed, there must be an offer and acceptance."  *Pakideh v. Franklin Commercial Mortg. Grp., Inc.*, 540 N.W.2d 777,

780 (Mich. Ct. App. 1995); *see also Kamalnath v. Mercy Mem'l Hosp. Corp.*, 487 N.W.2d 499, 503 (Mich. Ct. App. 1992) ("A contract is made when both parties have executed or accepted it, and not before."). "An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Kloian v. Domino's Pizza L.L.C.*, 733 N.W.2d 766, 770 (Mich. Ct. App. 2006) (internal quotation marks omitted). Similarly, "an acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Id.* at 771 (quotation marks omitted; alteration removed).

Beyond these requirements, the elements of a valid contract in Michigan are: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Hess v. Cannon Twp.*, 696 N.W.2d 742, 748 (Mich. Ct. App. 2005) (quotation marks omitted). Whether the parties have mutually agreed to be bound "is judged by an objective standard, looking to the express words of the parties and their visible acts, not their subjective states of mind." *Kloian*, 733 N.W.2d at 771 (quotation marks omitted); *see also Breitenbeck v. Merillat Indus., L.L.C.*, No. 258135, 2006 WL 859421, at *2 (Mich. Ct. App. Apr. 4, 2006) (unpublished opinion) (stating that Michigan courts look to whether the parties "manifested an intent to be bound by [a contract's] terms"). The party seeking to enforce a contract has the burden of showing that it exists. *Kamalnath*, 487 N.W.2d at 504 (quoting *Hammel v. Foor*, 102 N.W. 196, 200 (Mich. 1960)).

**B. Hergenreder Did Not Assent To An Arbitration Agreement With Bickford.**

The district court believed that Hergenreder was bound by the arbitration terms set out in the DRP because it believed that she was "reasonably notified of the DRP and [she] elected to accept and continue her employment." R. 20 at 6 (Order). This conclusion is based on Hergenreder's acknowledgment that she had read and understood the terms of the Handbook, including Section XII, which is entitled "Employee Actions":

"*Dispute Resolution Process*  Please refer to the Eby Companies Dispute Resolution Procedure (DRP) for details."  Handbook at 19 (emphasis in original).

Hergenreder argues that she was never informed that the DRP contained arbitration terms and constituted an arbitration agreement.  She also argues that, although she acknowledged reading and understanding the Handbook, neither the Handbook nor the specific reference to the DRP constitutes an agreement in any way.  Indeed, the form that she signed acknowledging her receipt of the Handbook provides that, "This handbook does not constitute any contractual obligation on my part nor on the part of Bickford Cottage[.]"  Hergenreder Br. at Ex. 6 (Receipt of Employee Handbook Form).  Third, she argues that the district court's interpretation of two Michigan cases involving arbitration agreements was incorrect.

Bickford agrees that the Handbook did not form a legally binding contract with Hergenreder.  Instead, it argues that "the DRP—a document separate and distinct from the Handbook—forms the contract," and it claims that Hergenreder "assented" to the DRP.  Bickford Br. at 12–13.  The key analytical step in Bickford's argument comes from the notion that Bickford needed only to "reasonably notif[y]" Hergenreder of the arbitration agreement, which it did, Bickford argues, by requesting that Hergenreder "Please refer to the Eby Companies Dispute Resolution Procedure (DRP) for details." *Id.* at 15–16 (citing *Guelff v. Mercy Health Servs.*, No. 200040, 1999 WL 33444156 (Mich. Ct. App. May 25, 1999) (unpublished opinion)).

We agree with Hergenreder.  There was neither an offer nor an acceptance.  The objective signs that Bickford made Hergenreder an offer to be part of the arbitration agreement are few in number.  The best Bickford can say is that Hergenreder was informed that, for "Employee Actions," she should "refer" to the DRP.  In Bickford's view, Hergenreder "was or should have been aware of the DRP and so is bound by it." Bickford Br. at 13 (capitalization removed).  Yet she was not *required* to refer to the DRP; the "handbook does not constitute any contractual obligation on [Hergenreder's] part nor on the part of Bickford Cottage[.]"  Hergenreder Br. at Ex. 6 (Receipt of Employee Handbook Form).  Moreover, the simple reference in the Handbook to "the

Eby Companies Dispute Resolution Procedure" for "details" is *not* "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Kloian*, 733 N.W.2d at 770 (internal quotation marks omitted). This statement says nothing about arbitration, and it says nothing that would indicate to Hergenreder that accepting or continuing her job with Bickford would constitute acceptance. Indeed, it is incorrect to conflate the fact that Hergenreder knew generally of the DRP with the notion that she knew of the arbitration language—and Bickford's desire to create an arbitration agreement—contained within the DRP. Were Hergenreder required to read, or even notified of the importance of reading, the DRP, the analysis here might be different. But this court's inquiry is focused on whether there is an objective manifestation of intent by Bickford to enter into an agreement with (and invite acceptance by) Hergenreder, and we are not convinced that there is any such manifestation made by Bickford in the record in this case. *See id.*

We are also not persuaded by Bickford's reliance on *Mannix v. Cnty. of Monroe*, 348 F.3d 526 (6th Cir. 2003), which interpreted Michigan law on employment-contract formation. *Mannix* stands for the proposition that "[d]istribution of a new employee handbook constitutes reasonable notice, regardless of whether the affected employee actually reads it." 348 F.3d at 536. The company at issue in *Mannix* had "posted the revised [employment policies] at least four months before the [plaintiff's] termination . . . on an internal database available to employees." *Id.* "To spread the word of the revised policies, the County held meetings between department heads and employees and put the policies on the County's email system." *Id.* "This," the court held, "was reasonable notice." *Id.* In the present case, however, there is no evidence that the DRP was "posted" in a place—either physical or electronic—available to Hergenreder, that there were meetings at which Hergenreder was notified of the policies, or that Hergenreder was aware of the DRP at all. Despite Knight's vague claim that the DRP "is distributed to employees," R. 13-4 at 2 (Knight Aff.), Bickford does not argue that it actually distributed or made the DRP available to Hergenreder.

Furthermore, even if Bickford were deemed to have made an offer to Hergenreder, we see no evidence that Hergenreder "manifest[ed] an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Kloian*, 733 N.W.2d at 771 (quotation marks omitted). Bickford claims that her acceptance occurred when she elected to accept or continue her employment, but there is no evidence that Hergenreder knew (1) that the DRP contained arbitration information or an arbitration agreement, or, more specifically, (2) that the arbitration provisions in the DRP provided that electing to accept or continue employment with Bickford would constitute acceptance of the DRP's arbitration terms. Indeed, Hergenreder had no reason to believe that electing to work for Bickford would constitute her acceptance of *anything*. She therefore did not "voluntarily undertak[e] some unequivocal act sufficient for th[e] purpose" of accepting the arbitration terms contained in the DRP. *Id.*

In this regard, several cases discussed by the parties and relied on by the district court support Hergenreder's side of the argument. First is *Kettles v. Rent-Way, Inc.*, No. 1:09-cv-230, 2009 WL 1406670 (W.D. Mich. May 18, 2009), in which the district court considered whether an arbitration agreement had been formed either by language contained in a company's handbook or by the plaintiff's receipt of a letter sent to the plaintiff by the company *after* the handbook was distributed announcing the arbitration plan. The court rejected the argument that the handbook created a binding agreement to arbitrate, even though the handbook specifically discussed the company's binding arbitration program, because the handbook had language similar to the Handbook in this case stating that the handbook did not constitute a contract. *Id.* at *9. It relied, in part, on *Heurtebise v. Reliable Business Computers, Inc.*, in which the Michigan Supreme Court held that a company handbook does not form a contract where it specifically states that it is not a contract. 550 N.W.2d 243, 247 (Mich. 1996) (plurality opinion); *id.* at 258 (Boyle, J., concurring). With respect to the second argument advanced by the defendant in *Kettles*, however, the district court agreed with the defendant: "RentWay . . . also issued a separate document, which did not contain [language stating that it was not a contract], which obligates Kettles to submit these claims to its 'Solutions'

ADR/arbitration program." *Kettles*, 2009 WL 1406670, at \*10. Specifically, because the separate document that was sent to the plaintiff "was not merely a general statement of what employees should expect," like the handbook, but rather "explicitly states it is intended to be a binding contract between RentWay and its employees," the district court held that the plaintiff was bound by the arbitration terms in that document. *Id.*

The district court's resolution in *Kettles* supports Hergenreder's argument because there is no evidence that Hergenreder was provided the DRP at any time. There is no evidence that Hergenreder knew of the DRP, much less received a copy of it, and the Handbook's reference to the DRP, generally, "for details" on "Employee Actions" did not notify Hergenreder of the arbitration agreement, much less notify her in a manner similar to *Kettles*.

We conclude that *Guelff v. Mercy Health Servs.*, No. 200040, 1999 WL 33444156 (Mich. Ct. App. May 25, 1999) (unpublished opinion), is distinguishable. The handbook (or manual) at issue in *Guelff* did not contain the language present both here and in *Kettles* stating that it did not form a contract. The Michigan Court of Appeals therefore held that the arbitration language in the manual *was* binding. *Id.* at \*2. It also rejected the plaintiff's argument that the manual could not be binding on her because she did not have knowledge of it. The manual was located in the plaintiff's workplace, and "an affidavit of Mercy's human resource director established that during the years of plaintiff's employment, she availed herself of many of the benefit provisions contained in the guidelines manual." *Id.* "Under these circumstances," the court held, "plaintiff's conduct conveyed assent to the written policies, and even though plaintiff claimed that she did not have actual knowledge of the manual, the distribution of the manual provided plaintiff with reasonable notification of the employment guidelines." *Id.* (internal citation omitted). *See also Ehresman v. Bultynck & Co., P.C.*, 511 N.W.2d 724, 726 (Mich. Ct. App. 1994) (holding that Ehresman assented to an arbitration agreement, even though he did not sign the agreement, because he "accepted the delivery of the agreement[] and operated under [its] terms").

This case is similar to *Guelff* in that Hergenreder claims that she had no knowledge of the DRP, but, unlike *Guelff*, there is no evidence that the DRP was available to Hergenreder, nor is there evidence that she otherwise availed herself of benefits contained therein. As a result, if *Guelff* stands, as Bickford and the district court claimed, for the proposition that an agreement can be formed where the offeree had "reasonable notification" of the offer, Hergenreder was not "reasonabl[y] notifi[ed]" that the DRP contained an offer to enter into an arbitration agreement. Moreover, Hergenreder certainly was not notified that her acceptance of employment (or continuation of employment) with Bickford would constitute acceptance of that offer. She also did not otherwise avail herself of the agreement in any way. These cases therefore do not support Bickford's claim that an arbitration agreement was formed.

At bottom, Bickford's argument boils down to the following contention: if Hergenreder has no reason to believe that a certain document contains an offer to enter into an agreement, and if she is not contractually obligated to read that document, then she will nonetheless be bound to the agreement contained in that document if she unwittingly takes actions that the document says will constitute acceptance of the offer. There is no support for this proposition in Michigan law.

Lastly, we also note that the parties dispute whether, in addition to assenting to the arbitration agreement contained in the DRP, Hergenreder waived her right to a jury trial under the Seventh Amendment. "[T]he question of right to jury trial is governed by federal and not state law"; this court must ask whether that waiver was knowing and voluntary. *K.M.C. Co. v. Irving Trust Co.*, 757 F.2d 752, 755–56 (6th Cir. 1985). This court uses the following factors to determine whether a waiver of the right to a jury trial has been knowing and voluntary:

> (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Morrison v. Circuit City Stores, Inc.*, 317 F.3d 646, 668 (6th Cir. 2003) (en banc).  Yet "[i]f the claims are properly before an arbitral forum pursuant to an arbitration agreement, the jury trial right vanishes."  *Cooper v. MRM Inv. Co.*, 367 F.3d 493, 506 (6th Cir. 2004).

Bickford argues that these factors have been met by Hergenreder's assent to the arbitration agreement.  As explained above, we hold that Hergenreder did not enter into an arbitration agreement, but even if she did, we believe that the *Morrison* factors weigh against a finding of a knowing and voluntary waiver.  Her "experience, background, and education" are not provided in the record, but "consideration for the waiver" favors Bickford, because there was consideration—her continued employment by Bickford.  The other factors favor Hergenreder, however, because the fact that she was not reasonably notified of the agreement makes it impossible to say that she had time to consider the waiver of her right to a jury trial or that the clarity of the waiver matters.  Of greatest importance is the "totality of the circumstances" factor, which best sums up the issue of whether Hergenreder knowingly and voluntarily waived her right to a jury trial:  She simply did not know that the DRP contained an arbitration agreement, nor was she obligated to inform herself of what the DRP contained.  Therefore, even if an arbitration agreement were formed, on these facts Hergenreder did not knowingly and voluntarily waive her right to a jury trial.  As explained above, however, we hold that Hergenreder did not enter into a binding arbitration agreement, and we therefore reverse the district court's judgment granting Bickford's motion to compel arbitration and dismissing the case.

### III.  CONCLUSION

For the reasons stated above, we **REVERSE** the district court's judgment granting Bickford's motion to compel arbitration and dismissing the case, and we **REMAND** this case for proceedings consistent with this opinion.